**FILED**
**CLERK**

4/12/2016 2:58 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
HSBC BANK USA, N.A.,

                    Appellant,

    -against-

RAYMOND E. ZAIR, CHRISTINE M. ZAIR,
and MARIANNE DEROSA, TRUSTEE,

                    Appellees.
------------------------------------------------------------------------x

**MEMORANDUM OF
DECISION AND ORDER**
15-cv-4958 (ADS)

## APPEARANCES:

**McCabe Weisberg & Conway, PC**
*Attorneys for the Appellant*
145 Huguenot Street, Suite 210
New Rochelle, NY 10801
        By:  Irene M. Costello, Esq.
            Charles A. Higgs, Esq., Of Counsel

**Ronald D. Weiss, P.C.**
*Co-Counsel for the Appellees Raymond E. Zair and Christine M. Zair*
734 Walt Whitman Road
Melville, NY 11747
        By:  Nathan Z. Kaufman, Esq., Of Counsel

**Eugene R. Wedoff, Esq.**
*Co-Counsel for the Appellees Raymond E. Zair and Christine M. Zair*
144 N. Elmwood Avenue
Oak Park, IL 60302

**Krista M. Preuss, Esq.**
*Attorney for Appellee Marianne DeRosa, Trustee*
115 Eileen Way, Suite 105
Syosset, NY 11791

1

**SPATT, District Judge:**

When a debtor files for Chapter 13 bankruptcy protection, the United States Bankruptcy Code strictly regulates the manner in which the debtor's secured creditors are repaid. In particular, under the provisions of 11 U.S.C. § 1325(a)(5), a repayment plan is only confirmable if, with respect to each secured creditor, one of the following is true: (1) the creditor consents to the plan, id. § 1325(a)(5)(A); (2) the plan provides for the creditor to retain his security interest in his collateral and receive periodic payments equaling the present value of the collateral, id. § 1325(a)(5)(B); or (3) the debtor agrees to surrender the collateral so that the creditor may pursue any legal remedies he may have, id. § 1325(a)(5)(C).

These are the exclusive methods of repaying a secured creditor, and a proposed Chapter 13 plan which, as to each secured claim, does not satisfy one of these three requirements, cannot be confirmed, even if the plan complies with the Bankruptcy Code in all other respects.

Against this backdrop, the present case calls for the Court to enter an ongoing debate over the answer to the following question: Is the surrender option found in § 1325(a)(5)(C) satisfied by a Chapter 13 plan that purports to "vest" title to collateral in a secured creditor pursuant to § 1322(b)(9) over that creditor's objection? Posed differently, can a confirmable Chapter 13 plan both "vest" title to real property *and* "surrender" that property to a common secured lender? If so, can the creditor refuse to accept the vesting in satisfaction of its claim? Can a court nevertheless compel the transfer over the creditor's objection?

In this case, confronted with an apparent division in the relevant caselaw, the United States Bankruptcy Court for the Eastern District of New York (Trust, *J.*) (the "Bankruptcy Court") on August 13, 2015 confirmed the Chapter 13 plan (the "Plan") of the Appellees Raymond E. Zair and Christine M. Zair (together, the "Debtors"), which provided that: (i) certain real property of the Debtors, which secured a mortgage loan issued by the Appellant HSBC Bank USA, N.A. ("HSBC" or the "Bank"), would be surrendered to the Bank in satisfaction of its secured claim pursuant to § 1325(a)(5)(C); and (ii) over the Bank's objection, title to the property would also vest in the Bank pursuant to § 1322(b)(9), thereby divesting the Debtors of their interest in the property, and creating a present possessory ownership interest in HSBC.

On August 24, 2015, the Bank appealed from the Bankruptcy Court's decision, arguing principally that, with respect to a common secured lender, the legal concepts of "surrender" and "vesting" are inherently incompatible. Thus, to the extent the Debtors' Plan in this case provided for both; and because the Plan did not satisfy any of the other requirements for plan confirmation found in § 1325(a)(5); the Bankruptcy Court erred in determining that the Plan was confirmable. For the reasons that follow, this Court agrees, and finds that the weight of persuasive authority supports a finding that a secured creditor's rights under § 1325(a)(5) are impermissibly compromised by a Chapter 13 plan that provides for non-consensual vesting under § 1322(b)(9).

Thus, the Court reverses the underlying decision of the Bankruptcy Court; vacates the subject confirmation order; and remands this matter for further proceedings consistent with this Opinion.

## I.    Background

Unless otherwise noted, the following facts are drawn from the underlying order of the Bankruptcy Court, see In re Zair, 535 B.R. 15 (Bankr. E.D.N.Y. 2015) ("Zair I"), and are not in dispute.

In October 2013, Superstorm Sandy destroyed the principal residence of the Debtors, located at 88 Nebraska Street in Long Beach (the "Long Beach Residence"). Due to the storm damage, the Debtors moved to a new home in Melville, and did not return to the Long Beach Residence.

On or about September 30, 2014, the Debtors filed for Chapter 13 bankruptcy protection. Schedule "A" to their bankruptcy petition, which relates to real property in the bankruptcy estate, identified the vacant Long Beach Residence as having a value of $255,000, and as being encumbered by two mortgages. The first-priority mortgage was held by HSBC and had an outstanding balance of $387,185.41. A junior mortgage was held by Bank of America, N.A. ("Bank of America") and had an outstanding balance of $30,437.51.

On or about November 26, 2014, HSBC filed a proof of claim in the amount of $440,380.68, representing the principal unpaid balance on its mortgage, plus interest, fees and pre-petition arrearages. Bank of America, through its servicing

agent, Green Tree Servicing LLC, also filed a proof of claim for the amount due on its mortgage.

On April 27, 2015, the Debtors filed and served a second amended Chapter 13 plan (previously defined as the "Plan"), which is at issue in this appeal. As described by the Bankruptcy Court, the Plan provided, in relevant part, that: (i) the Debtors would surrender the Long Beach Property to HSBC in full satisfaction of the secured portion of the Bank's mortgage loan; (ii) to the extent that the outstanding balance on the Bank's loan exceeded the value of the Long Beach Residence, the Bank would have thirty days to file an unsecured deficiency claim; and (iii) upon confirmation of the Plan, title to the Long Beach Residence would vest in the Bank. See Zair I, 535 B.R. at 17 (quoting Plan ¶¶ 2, 7).

The Debtors and the assigned Chapter 13 Trustee Marianne DeRosa (the "Trustee") supported confirmation of the Plan. However, HSBC objected, arguing, as it does here, that, although the Long Beach Residence can and should be surrendered under § 1325(a)(5)(C), so that the Bank may pursue state foreclosure proceedings as it deems appropriate, it would be improper to transfer title to the Long Beach Residence – and all of the concomitant carrying costs – to the Bank without its consent. In this regard, the Bank contends that the Plan is legally untenable because the concepts of surrender and vesting cannot coexist relative to a common piece of secured property.

The Bankruptcy Court disagreed with the Bank's position, and held that "while surrender and vesting are different, they are not mutually exclusive, and the

Bankruptcy Code's plain language permits a debtor to deploy both options in a plan." Id. at 21. As noted above, HSBC appealed the Bankruptcy Court's decision to this Court.

## II. Discussion

### A. The Standard of Review

This Court is vested with appellate jurisdiction over "final judgments, orders, and decrees" of the Bankruptcy Court. See 28 U.S.C. § 158(a); see also Fed. R. Bankr. P. 8013; KLG Gates LLP v. Brown, 506 B.R. 177, 189 (E.D.N.Y. 2014) (Spatt, J.). The Court reviews the Bankruptcy Court's legal conclusions, including determinations on matters of statutory construction, *de novo*. See In re Bethlehem Steel Corp., 02-cv-2854, 2003 U.S. Dist. LEXIS 12909, at *20 (S.D.N.Y. 2003) (citing In re Air Crash Off Long Island, New York, 209 F.3d 200, 202 (2d Cir. 2000)).

### B. The Relevant Statutory Framework

As noted above, two statutory provisions are at the heart of this appeal. The first is 11 U.S.C. § 1325(a)(5), which provides that, as to each secured creditor, a Chapter 13 plan may only be confirmed:

> (1) when the secured creditor accepts the plan; (2) when the debtor surrenders the secured property; or (3) in an option known as a cramdown, when the debtor, over the creditor's objection, retains the secured property, "yet pay[s] only the present value of the collateral to the creditor . . . over the life of the plan," with "[t]he remaining balance of the debt [becoming] a general unsecured claim."

AmeriCredit Fin. Servs. v. Tompkins, 640 F.3d 753, 756 (2d Cir. 2010) (quoting Capital One Auto Finance v. Osborn, 515 F.3d 817, 820 (8th Cir. 2008)).

Thus, where, as here, "a secured creditor does not accept a debtor's Chapter 13 plan, the debtor has two options for handling allowed secured claims: surrender the collateral to the creditor, see § 1325(a)(5)(C); or, under the cram down option, keep the collateral over the creditor's objection and provide the creditor, over the life of the plan, with the equivalent of the present value of the collateral, see § 1325(a)(5)(B)." Assocs. Commer. Corp. v. Rash, 520 U.S. 953, 962, 117 S. Ct. 1879, 138 L. Ed. 2d 148 (1997). This case involves the "surrender" option.

The second relevant Code provision is 11 U.S.C. § 1322(b)(9), which provides that "the plan may . . . provide for the vesting of property of the [bankruptcy] estate, on confirmation of the plan or at a later time, in the debtor or in any other entity."

Although the Bankruptcy Code does not define "surrender" or "vesting," the parties agree, and the law is well-settled, that these terms are not synonymous. For example, "surrender does not require the debtor to physically transfer the collateral to the secured creditor, [but] does require the debtor to make the collateral available to the secured creditor." In re Higley, 539 B.R. 445, 449 (Bankr. D. Vt. 2015); accord In re Williams, 542 B.R. 514, 518 (Bankr. D. Kan. 2015) (noting that "surrender . . . has a well defined meaning," namely, "the relinquishment of all rights in property, including the right to possess the collateral. Surrender does not transfer ownership. Rather, surrender means only that the debtor will make the collateral available so the secured creditor can, if it chooses to do so, exercise its state law rights in the collateral" (internal citations omitted)); Wiggins v. Hudson City Sav. Bank, 2015 Bankr. LEXIS 2606, at *9 (Bankr. D.N.J. Aug, 4, 2015)

("Although not defined in the Bankruptcy Code, 'surrender' refers to the 'act of a debtor surrendering collateral to a lienholder who then disposes of the property pursuant to the requirements of state law'" (quoting <u>In re Behanna</u>, 381 B.R. 631, 640 (Bankr. W.D. Pa. 2008))); <u>In re Sagendorph</u>, 2015 Bankr. LEXIS 2055, at \*6 (Bankr. D. Mass. June 22, 2015) ("'Surrender' in the present context is that a debtor agreed to make the collateral *available* to the secured creditor – *viz.*, to cede his possessory rights in the collateral"); <u>In re Ware</u>, 533 B.R. 701, 712 (Bankr. N.D. Ill. 2015) ("Put simply, surrender under 1325 requires at a minimum the surrender of all of the rights that the debtor has").

By contrast, "vesting" is a more "consequential event" than surrender.  <u>See</u> <u>Williams</u>, 542 B.R. at 518.  Whereas "[s]urrender means making the property available to be taken; vesting means transferring title."  <u>Id.</u>; <u>see, e.g.</u>, <u>In re Tosi</u>, 2016 Bankr. LEXIS 690, at \*12-\*13 (Bankr. D. Mass. Mar. 4, 2016) ("[T]o vest property in another, as contemplated in 11 U.S.C. § 1322(b)(9) . . . is to effect a transfer of ownership of that property from the [bankruptcy] estate to another person or entity. Vesting means transferring title" (internal quotation marks and citations omitted)); <u>Williams</u>, 542 B.R. at 518 ("'Vesting' is also not defined in the Code. But its plain meaning 'includes a present transfer of ownership.'" (quoting <u>In re Rosa</u>, 495 B.R. 522, 523 (Bankr. D. Haw. 2013))); <u>Sagendorph</u>, 2015 Bankr. LEXIS 2055, at \*6-\*7 ("'[v]esting' . . . plainly means to place one in legal possession or ownership of property"); <u>Bank of N.Y. Mellon v. Watt</u>, 14-cv-2051, 2015 U.S. Dist. LEXIS 54041, at \*11-\*12 (D. Or. Apr. 22, 2015) ("[V]esting is the mechanism that,

8

in the context of real property, transfers title and, by extension" extinguishes the debtor's continuing obligations and liabilities).

## C.    Summary of the Arguments

As noted above, HSBC argues principally that the legal concepts of "surrender" and "vesting" are mutually exclusive, and therefore, with respect to a secured claim, a Chapter 13 plan that provides for one must not provide for the other.  Applied here, HSBC argues that, to the extent the Plan invokes § 1322(b)(9) to non-consensually vest title to the Long Beach Residence in the Bank, it cannot also provide for the Long Beach Residence to be "surrendered" under § 1325(a)(5)(C).  Under this scenario, because compliance with § 1325(a)(5) is mandatory; and because the Plan does not satisfy any of the other requirements for plan confirmation found in that provision; the Plan is not confirmable, as a matter of law, and the Bankruptcy Court erred in concluding otherwise.

As a practical matter, the Bank seeks to avoid the "vesting" option because, as one bankruptcy court in this Circuit noted, being "stuck with the collateral" means being "responsible for the maintenance, taxes, and other obligations that come with owning property."  In re Sherwood, 2016 Bankr. LEXIS 263, at *9 (Bankr. S.D.N.Y. Jan. 28, 2016) (quoting In re McCann, 537 B.R. 172, 179 (Bankr. S.D.N.Y. 2015)).  Ordinarily, "until the property is actually sold pursuant to a foreclosure sale, title to the property [and all of the attendant carrying costs] remain[ ] vested in the debtor."  In re Sneijder, 407 B.R. 46, 52-53 (Bankr. S.D.N.Y. 2009).  However, "vesting" the Long Beach Residence in the Bank would force it to

assume immediate ownership of the property, which was destroyed in a storm in 2013, and has since remained vacant and in disrepair.

As a mortgage holder, HSBC would understandably prefer to leave the Debtors in possession of the Long Beach Residence, while it takes whatever steps it deems are appropriate to enforce its lien through foreclosure proceedings. Or, if the Bank sees fit, it could take no steps at all. See In re Rose, 512 B.R. 790, 793-94 (Bankr. W.D.N.C. 2014) ("Although 'surrender' envisions a debtor relinquishing his or her rights in the collateral, there is no corresponding requirement that the lender [ ] do anything with the property"). In this regard, the Bank's position is that it has the right to "control its remedies," id. at 794, and the Court may not, over its objection, require HSBC to either "accept a surrender of property or take possession of or title to it through repossession or foreclosure." Id. (quoting In re Arsenault, 456 B.R. 627, 630 (Bankr. S.D. Ga. 2001), aff'd, 2012 U.S. Dist. LEXIS 128412 (S.D. Ga. Aug. 20, 2012))).

In this regard, HSBC's argument is rooted in principles of state law. In particular, relying on the Supreme Court's opinion in Butner v. United States, 440 U.S. 48, 55, 99 S. Ct. 914, 59 L. Ed. 2d 136 (1979), which recognized that "[p]roperty interests are created and defined by state law," the Bank contends that New York is a so-called "lien theory state," meaning that, as the mortgagee, the Bank has only a lien on the Debtors' property, not legal or equitable title. According to the Bank, the Debtors' Plan interferes with this legal status by imposing an ownership interest in the Long Beach Residence for which the Bank did not bargain.

Also, the Bank asserts that the Plan violates New York's Statute of Frauds because, by vesting in the Bank a present possessory ownership interest in the Long Beach Residence, it materially alters the parties' contract rights under the applicable mortgage documents, and there is no signed writing to that effect.

The Debtors and the Trustee respond by arguing that the Bank's interpretation of the relevant Code provisions runs counter to the overarching goal of Chapter 13, which is to provide a "fresh start" to debtors. Counsel for the Debtors in this case explained their position lucidly:

> Congress enacted Chapter 13 of the Bankruptcy Code to "provide expanded relief to a debtor" and an adequate opportunity for a "fresh start . . . essential to modern bankruptcy law.'" In re Sher, 12 B.R. 258, 265 (Bankr. S.D.N.Y. 1981 (citing House Report No. 95-595, 95th Cong., 1st Sess. 117 (1977)). For a debtor burdened by the ownership costs of property that the debtor cannot live in – costs that may include real estate taxes, maintenance, and insurance – §§ 1322(b)(8) and (9) are critical to the debtor's fresh start. They allow the debtor to pay a claim secured by the property through transferring the property to the creditor holding the security interest. This not only removes ongoing ownership costs for the debtor, it allows the creditor to obtain the property more quickly and at less cost than a foreclosure would require.

See Br. for Debtors at 9; see also Br. for Trustee at 8 ("Without being able to vest the property, as is specifically permitted under Section 1322(b)(9), the Debtors are at the whim of the [Bank] and will be incurring expenses associated with the Property, such as real estate taxes, until if and when the [Bank] completes a state court foreclosure. . . . Allowing debtors to be saddled with this debt and other related debt or to continue to be burdened with ownership of property they cannot manage goes against the 'fresh start' policy of the Bankruptcy Code").

Thus, it is the Appellees' position that § 1322(b)(9) provides a mechanism by which debtors can offload property that they can no longer afford, and secured creditors may not frustrate that process by refusing the transfer of the collateral. See Br. for Debtors at 6 (arguing that the Bank's interpretation "makes it impossible for a Chapter 13 plan to pay a debt by transferring surrendered property unless the creditor consents").

As for the Bank's arguments concerning the application of state law, the Debtors and the Trustee contend, as a matter of Constitutional law, that the Bankruptcy Code preempts these principles.

With these contentions in mind, the next step in the Court's analysis is to determine whether and to what extent § 1325(a)(5)(C) and § 1322(b)(9) have been understood to coexist in a valid Chapter 13 plan.

**D.    The Interplay of § 1325(a)(5)(C) and § 1322(b)(9)**

**1.    The State of the Law at the Time of the Underlying Decision**

At the time of the Bankruptcy Court's decision below, two divergent lines of cases had emerged.  One line of cases, exemplified by <u>In re Rosa</u>, 495 B.R. 522 (Bankr. D. Haw. 2013), supports the Debtors' position.  It holds that a Chapter 13 plan may vest title to real property in a secured creditor under § 1322(b)(9) and still be confirmable under the surrender option found in § 1325(a)(5)(C).

For example, in <u>In re Rosen</u>, 2015 Bankr. LEXIS 4448 (Bankr. D. Kan. Feb. 24, 2015), the bankruptcy court permitted the debtors to amend their Chapter 13 plan to provide for real property to vest in a secured creditor, in addition to being

surrendered to that creditor. The court noted that the debtors had "patiently waited for [the mortgagee] to take legal steps to foreclose the[ ] security interests in good faith," while at the same time remaining liable for property taxes, maintenance, upkeep, and municipal fees and penalties. See id. at *3, *6. Thus, the court reasoned that allowing the debtors to divest themselves of the burdens of owning this property was consistent with the plain language of § 1322(b)(9) and "the broader principal purpose of the Bankruptcy Code, which is to grant a fresh start to the honest but unfortunate debtor." Id. at *5 (internal quotation marks and citations omitted).

Similarly, in In re Sagendorph, 2015 Bankr. LEXIS 2055, the bankruptcy court found nothing inherently inconsistent between § 1325(a)(5)(C) and § 1322(b)(9), and held that "[a] plan which contains a provision for transferring or vesting in the secured creditor the property that is its collateral would be confirmable under § 1325(a)(5)(C) because a transfer of property presupposes its surrender by the transferor." Id. *13. Stated otherwise, consistent with an argument advanced by the Trustee in this case, the court reasoned that "[s]urrendering, or ceding possessory rights is a preliminary step in the process of transferring title." Id. (internal quotation marks and citation omitted); see Br. for Trustee at 7 (arguing that "surrender is a condition precedent to vesting property" because "Debtors cannot vest the property without surrendering it first").

Consistent with Rosen, the Sagendorph court also emphasized debtors' need

for a "fresh start," referring to that policy rationale as the "paramount federal interest" behind its decision.

However, the Court notes that <u>Rosa</u>, the fountainhead of this line of cases, is materially distinguishable from this case.  Unlike here, in <u>Rosa</u>, the mortgagee did not object to the proposed vesting.  <u>See</u> <u>Rosa</u>, 495 B.R. at 522-23, 525.  The court specifically noted that the "surrender" option in § 1325(a)(5)(C) would not have "fully validate[d]" the plan in that case precisely "*because* the debtor propose[d] vesting in addition to surrender."  <u>Id.</u> at 524 (emphasis supplied).  Indeed, the <u>Rosa</u> court hypothesized situations where a "mortgagee may have legitimate reasons to object" to such a plan, for example, where the subject property "is contaminated by hazardous waste or subject to exorbitant [homeowners'] association fees"; or where "the property is subject to other liens or co-ownership interests," in which case "vesting plus the doctrine of merger might extinguish the mortgage."  <u>Id.</u> at 525. However, unlike in this case, in <u>Rosa</u>, "the fact remain[ed] that the first mortgagee received adequate notice . . . and did not object" to the proposed plan.  <u>Id.</u>

Thus, critically, the <u>Rosa</u> case was not decided under § 1325(a)(5)(C).  Rather, the court there determined that the secured creditor had consented to its treatment, and the plan was confirmed under § 1325(a)(5)(A).  <u>See</u> <u>id.</u>  Under these circumstances, the Court is of the view that the <u>Rosa</u> decision is not analogous to the present case, and indeed, forms a questionable foundation for the line of subsequent cases, relied upon by the Appellees, which purport to extend the holding of <u>Rosa</u> to situations, like the present case, involving § 1325(a)(5)(C).

By contrast, the second line of cases, exemplified by In re Malave, 2014 Bankr. LEXIS 5383 (Bankr. S.D.N.Y. 2014), supports the Bank's position. It holds that "[w]hen a secured creditor timely objects to the confirmation of a plan that proposes to vest title in that creditor, the court cannot confirm the plan" under § 1325(a)(5)(C). See id. at *3-*4.

For example, in In re Rose, 512 B.R. 790 (Bankr. W.D.N.C. 2014), the bankruptcy court confirmed a plan under which the debtors surrendered encumbered property to the mortgagee. However, for more than a year the mortgagee took no action to foreclose on the property, and the debtors remained liable for continuing post-petition obligations, including taxes and maintenance costs. The "[f]rustrated" debtors sought permission from the bankruptcy court to transfer the property by quitclaim deed to the mortgagee over its objection. The Rose court recognized that, although "the creditor's failure to foreclose might leave the debtors with continued liabilities, these are by-products of property ownership," and the debtors' preference to "walk away from the property . . . does not justify shifting these burdens to the lender." Id. The court noted that "[m]ost courts that have considered the matter agree [that] . . . the 'secured creditor . . . has the prerogative to decide whether to accept or reject the surrendered collateral.'" Id. (citations omitted).

In oft-cited language, the court found that forcing a lender to take title to property "opens up a Pandora's box of possible injuries to lenders":

First, and obviously, forcing a lender to take title causes it to assume burdens of ownership for which it did not contract. The costs of foreclosure or repossession, coupled with ongoing obligations to insure the property and to pay *ad valorem* taxes, may well exceed any present net realizable value.

Second, if the property is subject to multiple encumbrances, requiring a senior lender to accept title to its collateral would destroy that lender's priority lien position vis a vis junior mortgages, liens, and accrued [homeowners' association] obligations. . . . [T]he quitclaim scenario makes the lender owner of the property and, under the doctrine of merger, it takes title subject to these interests.

A worse fate awaits the lender if the quitclaimed property is subject to environmental contamination. Making the lender the record owner [of] its collateral potentially subjects it to personal liability for existing environmental contamination . . .

The potential for personal liability also exists if the collateral property is dilapidated, damaged, or otherwise a public nuisance.

Id. at 795-96 (internal citations omitted).

A similar result was reached in the case of Bank of N.Y. Mellon v. Watt, 14-cv-2051, 2015 U.S. Dist. LEXIS 54041 (D. Or. Apr. 22, 2015). In that case, the district court reversed a bankruptcy court decision confirming a Chapter 13 plan that proposed surrendering an encumbered townhouse to the mortgagee under § 1325(a)(5)(C), *and* vesting title to the townhouse in the same creditor under § 1322(b)(9). The court noted that, despite the authority in § 1322(b)(9) to vest property of the bankruptcy estate in other persons, in order to be confirmable, the plan must nevertheless comply with the requirements found in § 1325(a)(5), specifically, the surrender option found in § 1325(a)(5)(C).

Consistent with Rose, the court noted that "surrender" implies a degree of freedom on the part of secured creditors to accept or reject collateral. Thus, if the debtors had "surrendered" the townhouse in satisfaction of the mortgage, it would not extinguish their continuing liability for homeowners' association fees. By contrast, "vesting" the townhouse in the mortgagee would operate as a complete transfer of ownership, thereby cutting off the debtors' liability for post-petition assessments, and transferring that obligation to the lender. See id. at *14 (noting that the debtors' plan "did not merely propose the cessation of their interest in the Property, it also forcibly transferred that interest, and the attendant liabilities, to [the bank]").

The court in Watt, emphasized the rights afforded to secured creditors under the Bankruptcy Code, finding that by "confirming a Chapter 13 plan that advanced non-consensual vesting in conjunction with surrender, the bankruptcy court [had] read language into the bankruptcy Code that does not exist, as well as frustrated the purpose of the statute, which is to provide protection to creditors holding allowed secured claims." Id. at *15-*16. Further, the court found that "the bankruptcy court's interpretation impermissibly transform[ed] the secured creditor's right into an obligation, thereby rewriting both the Bankruptcy Code and the underlying loan documents . . ." Id. at *16-*17.

Of particular note, the court in Watt specifically addressed, and rejected, the overreliance the Rosen line of cases had placed on the "fresh start" argument, which is advanced by the Debtors and the Trustee in this case:

Debtors assert repeatedly on appeal that a balance must be struck between the rights of creditors on the one hand, and the policy of affording the debtor a fresh start on the other. Their second amended plan, however, effectuated no such balance; it wholly eliminated their financial responsibility in relation to the Property, at the sole expense of a secured creditor.

Id. at *19 n.6 (internal quotation marks and citation omitted).

On August 13, 2015, confronted with this apparent split in the relevant authority, the Bankruptcy Court issued the underlying decision in this case, which explicitly departed from the Malave-Rose-Watt line of cases, and followed the Rosa-Rosen-Sagendorph line in concluding that the Debtors' Plan should be confirmed. See Zair I, 535 B.R. at 21 (noting that the Bankruptcy Court "disagree[d] with Watt and to some extent, with Malave" and "agree[d] for the most part with Sagendorph").

However, while this appeal was on submission, several other courts weighed in on this question, deepening the divide between the two emerging philosophies.

## 2.     Recent Developments in the Law

Less than one month after Zair I issued, a bankruptcy court sitting in the District of Minnesota decided In re Stewart, 536 B.R. 273 (Bankr. D. Minn. 2015). There, the court expressly adopted the reasoning of both Sagendorph and Zair I in concluding that "[w]hile the 'surrender' concept found in § 1325(a)(5)(C), and the 'vesting' concept embodied in § 1322(b)(9) are different, they may nonetheless be used in tandem when providing for the treatment of a secured claim in a chapter 13 plan." Id. at 277. However, the court in Stewart did not answer the central question presented here, namely, whether these provisions may be used in tandem

18

where, as here, *the creditor objects to the plan*. As in <u>Rosa</u>, discussed <u>supra</u>, the secured creditor in <u>Stewart</u> did not object to the debtors' proposed Chapter 13 plan before it was confirmed. Therefore, the court relied upon an unrelated provision of the Bankruptcy Code, namely, 11 U.S.C. § 1327(a), to hold that the creditor was bound by the terms of the already-confirmed plan. In the Court's view, like <u>Rosa</u>, the <u>Stewart</u> case is of limited usefulness to the instant appeal.

Nonetheless, two months after <u>Stewart</u>, another bankruptcy court sitting in the District of Kansas decided <u>In re Williams</u>, 542 B.R.514 (Bankr. D. Kan. Dec. 2, 2015). In that case, the court confirmed an initial plan by the debtor whereby his former residence would be surrendered to Wells Fargo, the mortgagee, under § 1325(a)(5)(C). To that end, the debtor abandoned the property, allowing Wells Fargo to enter the premises, change the locks, and generally maintain the property. However, several months passed without the mortgagee taking any steps to foreclose its security interest, and so the debtor made a motion to amend the plan to provide for the property to "vest" in Wells Fargo under § 1322(b)(9). The bank objected.

Upon reviewing the relevant caselaw, including <u>Zair I</u>, the bankruptcy court found in favor of the mortgagee, holding that § 1325(a)(5) "does not permit confirmation of a plan vesting title to collateral in the secured creditor over that creditor's objection." <u>Id.</u> at 521.

In reaching this conclusion, the court acknowledged the familiar argument that allowing a debtor to vest encumbered property in a secured lender may

alleviate certain burdens of ownership and promote the idea of a "fresh start."  <u>See</u> <u>id.</u> (noting that "[i]t is tempting to hold that a plan providing for vesting may be confirmed over the secured creditor's objection" because, among other things, "[s]uch a holding would remove the burdens of property ownership" and "promote the debtor's fresh start").  However, explicitly agreeing with the <u>Watt</u> decision, discussed <u>supra</u>, the court found these considerations to be outweighed by the reality that "[v]esting the title over Well Fargo's objection would force it to accept the title and impose unbargained for obligations on it to pay taxes and other costs associated with the Property."  <u>Id.</u>

Shortly after <u>Williams</u>, in January of this year, another decision addressing this issue was rendered in <u>In re Weller</u>, 2016 U.S. Bankr. LEXIS 108 (Bankr. D. Mass. Jan. 13, 2016).  Of note, the <u>Weller</u> decision originated in the bankruptcy court for the District of Massachusetts, namely, the same district from which the <u>Sagendorph</u> decision issued.  However, although decided less than a year apart, the <u>Weller</u> court broke with the reasoning and conclusion in <u>Sagendorph</u>, and fell in line with the <u>Malave</u>-<u>Rose</u>-<u>Watt</u>-<u>Williams</u> line of cases.

In <u>Weller</u>, the debtors owned real property that was encumbered by a mortgage held by Wells Fargo.  The outstanding balance on the mortgage loan was approximately twice the value of the property.  Thus, when the debtors sought protection under Chapter 13, they proposed a plan whereby the property would be surrendered to Wells Fargo in satisfaction of the secured claim.  This plan was confirmed, but the bank refrained from foreclosing on the property for three years

after confirmation, during which time the debtors continued to pay the applicable carrying costs.

Eventually, the debtors became unable to continue meeting these expenses, and, "[w]ishing to relieve themselves of the burden of maintaining and insuring the Property, the Debtors decided to take another approach," namely, "propos[ing] that title to the Property vest in Wells Fargo upon confirmation of the Proposed Amended Plan." Id. at *3-*4. The bank objected.

In passing on the bank's objection, the Court held plainly that "[a] plan which 'vests' property in a secured creditor does not fulfill the requirements of § 1325(a)(5)(C) and may not be confirmed over that secured creditor's objection." Id. at *10. In reaching this conclusion, the Court conceded that § 1325(a)(5) and § 1322(b)(9) "are not in conflict," and hypothesized situations where a plan invoking both provisions might be confirmed:

> [F]or example, a debtor could propose a plan which would vest property in a grantee that has consented (or from whom the debtor plans to seek consent). Or could propose a plan which would vest property in a grantee in the hopes that such party will not object, and that its silence might be deemed consent.

Id. at *9.

However, the court clarified that, ultimately, § 1325(a)(5) outlines the exclusive methods of satisfying a secured claim, and "vesting" property in an unwilling lender is not one of them. Therefore, "[w]hat a Chapter 13 debtor may *not* do . . . is substitute the *options* which may be proposed by a plan under § 1322 for

*requirements* mandated by § 1325 for confirmation of a plan." Id. (emphasis in original).

Although sensitive to the fact that the debtors had "been left in limbo by Wells Fargo's failure to act," the court in Weller nevertheless held that the debtors' proposed plan to vest the property in Wells Fargo could not be confirmed over the bank's objection.

Two weeks later, a bankruptcy court in this Circuit took up the issue in a case called In re Sherwood, 2016 Bankr. LEXIS 263 (Bankr. S.D.N.Y. Jan. 28, 2016). In that case, the mortgagee bank objected to a plan that would both surrender real property of the debtor in satisfaction of its secured claim, *and* vest title to the property in the bank.

Similar to HSBC in this case, the mortgagee in Sherwood argued that, although "the Debtor [wa]s entitled to surrender property through her plan pursuant to section 1325(a)(5)(C)," "she [could] not compel [the bank] to accept title to the property under section 1322(b)(9) so long as [the bank] objects to such treatment." The bankruptcy court agreed, rejecting "[c]ases such as Watt I, Sagendorph, Zair [I], and Stewart [which] take the position that surrender and vesting are not mutually exclusive and that a provision vesting title in a secured creditor may be used in tandem with surrender in accordance with section 1325(a)(5)(C)," and instead finding "persua[sive] the emerging line of cases, exemplified by Rose, Malave, Watt[ ], Williams, and Weller, which hold that a chapter 13 plan may not be confirmed over the objection of a secured creditor where

the plan proposes to vest title to surrendered property in that creditor." <u>Id.</u> at *18-*19 (internal quotation marks and citations omitted).

The court in <u>Sherwood</u> recognized that "[w]here property is surrendered in a chapter 13 plan, there is often an 'expectation' that the creditor will promptly enforce its rights to recover and sell the property in order to satisfy its claim." <u>Id.</u> at *9 (quoting <u>McCann</u>, 537 B.R. at 179). The court further recognized that "at times, creditors may fail to exercise these rights, leaving debtors ' 'stuck with' the collateral' and 'responsible for the maintenance, taxes and other obligations that come with owning property.' " <u>Id.</u> However, this reality, though unfortunate, could not, in the view of the court, justify interpreting § 1322(b)(9) to "override the rights of a secured creditor under § 1325(a)(5)," which, as noted above, "includ[es] the option to do nothing to recover its collateral." <u>Id.</u> at *19-*21.

Of particular note, the <u>Sherwood</u> court was "not persuaded" by the conclusion in <u>Zair I</u> that "preventing a creditor from vesting surrendered property in a secured creditor over that creditor's objection 'essentially eliminates the usefulness of [section] 1322(b)(9).' " <u>Id.</u> at *20 (quoting <u>Zair I</u>, 535 B.R. at 21). On the contrary, the court noted that this conclusion incorrectly "assumes that section 1322(b)(9) can only be used to vest property in secured creditors, and that Congress must have intended for debtors to be able to vest surrendered property in secured creditors with or without their consent." <u>Id.</u> In this regard, the court noted several "permissible uses of section 1322(b)(9)" that either do not conflict with the surrender option, or do not implicate § 1325(a)(5) at all. For example:

[A] debtor might retain property under section 1325(a)(5)(B) while providing for title to vest in a nondebtor spouse, child, or wholly-owned entity for tax or estate planning purposes . . . Or, as the court suggested in <u>Weller</u>, a debtor might provide for the vesting of property in some other third party 'that has consented (or from whom the debtor plans to seek consent) . . . or in the hopes that such party will not object, and that its silence might be deemed consent.' . . . Or a debtor might provide for the vesting of completely unencumbered property, which would not implicate section 1325(a)(5) because there would be no allowed secured claim subject to that section.

<u>Id.</u> at *20-*21.

Most recently, on March 4, 2016, a bankruptcy court in the District of Massachusetts decided the case of <u>In re Tosi</u>, 2016 Bankr. LEXIS 690 (Bankr. D. Mass. Mar. 4, 2016). In that case, the debtor's plan proposed a two-tiered approach to dispose of encumbered property: "In the first instance, the Debtor would retain the Property, [the mortgagee's] collateral, for a period of up to ninety days in which he would attempt to broker a sale of the Property and, from the proceeds, pay [the mortgagee's] claim . . . [But] if a sale [wa]s not consummated within ninety days of confirmation . . . the debtor's interest in the property [would] be surrendered pursuant to section 1325(a)(5)(C) and [would] immediately vest in [the mortgagee] pursuant to sections 1322(b)(8) and (9) without further order of the court." <u>Id.</u> at 3 (internal quotation marks omitted). As in this case, the plan in <u>Tosi</u> was "predicated on the assumption . . . that vesting is a form of surrender and that surrendering and vesting are not mutually exclusive." <u>Id.</u> at *5.

The court rejected this notion, and held, in relevant part, that the proposed plan was not confirmable because: "[T]hough it use[d] the nomenclature of surrender, in fact it merely vest[ed] the property in [the mortgagee], an act that

substantially modifies [the mortgagee]'s rights as to its collateral, [wa]s thus inconsistent with surrender, and therefore effect[ed] no true surrender at all, merely a vesting." Id. at *12.

The court departed from the conclusion reached in Sagendorph, a prior decision of the same court, that "surrender, as a ceding of possessory rights, is merely 'a preliminary step in the transferring of title.' " Id. at *13. Rather, the Tosi court acknowledged that the legal distinction between surrendering and vesting affects the rights of the secured creditor, not just the debtor:

> [The Sagendorph court's] reasoning understates the meaning of surrender, which is not merely to cede [the debtor's] possessory rights, *but to permit the creditor to exercise its preexisting property rights as to the collateral*. The vesting of title in the mortgagee goes well beyond surrender of the collateral by altering the mortgagee's rights as the holder of a mortgage. . . . Upon the debtor's vesting of his interest in the secured creditor . . . [n]o longer would the secured creditor have the substantial prerogatives of a mortgagee. Among other things, it could not sell the property at foreclosure. In a foreclosure sale, unsatisfied junior liens are automatically discharged, but the vesting of title in the mortgagee would leave junior liens in place, meaning that the value of the mortgagee's interest would be diminished by the value of any such liens. In addition, the secured creditor would now be saddled with new responsibilities that arise from its new form of ownership, including real estate taxes, maintenance, the avoidance of nuisances, and environmental remediation responsibilities.

Id. at *13-*14 (emphasis supplied).

In perhaps the most forceful rejection of the debtors' position in recent decisional law, the court stated that:

> [V]esting precludes surrender: a debtor cannot permit a mortgagee to exercise its preexisting rights where, by vesting the mortgaged property in the mortgagee, it has altered those rights out of existence. Surrender of collateral to a mortgagee and vesting of the same collateral in the mortgagee are thus mutually exclusive. A plan cannot

do both while giving full and proper meaning to each term; and a plan that purports to do both at once must be denied confirmation as internally inconsistent.

*　　*　　*

Some debtors, as part of the fresh start they seek in bankruptcy, want to rid themselves of the burdens of property ownership. Where the mortgagee is not willing to simply take title or cannot or will not foreclose fast enough to provide the relief the debtors seek, debtors invoke the nomenclature of surrender to satisfy § 1325(a)(5). But where vesting occurs, there is no true surrender. The surrender is illusory, and therefore the plan does not satisfy § 1325(a)(5)(C).

Id. at *15-*16.

With these authorities in mind, the Court now turns to the merits of the present dispute, and in doing so, adds its voice to the growing majority of courts to interpret the Bankruptcy Code as prohibiting debtors from forcing secured lenders to accept title to encumbered property against the lenders' will.

## E.  As to Whether the Bankruptcy Court Erred in Confirming the Debtors' Plan

This Court is persuaded that the clear weight of authority – including the position unanimously adopted by other bankruptcy courts within this Circuit – supports the conclusion that the right of HSBC to control its own remedies respecting the Long Beach Residence cannot be subordinated to the Debtors' interest in achieving a fresh start in bankruptcy.

Initially, as a matter of statutory interpretation, the Court finds the position advanced by the Debtors and the Trustee in this case to be legally untenable. The plain language of § 1322(b)(9) provides that a Chapter 13 plan may, but is not required to, include one or more of a menu of optional features. However, nothing

in the language of the statute indicates that including one of these optional features *guarantees* the confirmability of the overall plan. See <u>Watt</u>, 2015 U.S. Dist. LEXIS 54041, at *13 (the fact that "section 1322(b)(9) permits inclusion of a nonstandard provision that vests property in a secured creditor does not resolve whether the plan can be confirmed with a nonstandard provision" (internal brackets omitted)); <u>see also</u> <u>Williams</u>, 542 B.R. at 521 ("Section 1322(b)(9) includes vesting as a discretionary term of a plan, but it does not assure confirmation of a plan providing for vesting"). Thus, the flaw in the Appellees' argument is the misapprehension that simply because the Code authorizes the use of vesting under some circumstances, that vesting *must* be appropriate in all circumstances. Such a construction is patently at odds with the permissive nature of § 1322(b)(9), which allows a plan to be confirmed with or without its inclusion. By contrast § 1325(a)(5) is not permissive. It is mandatory. A plan which does not strictly conform to one of its enumerated requirements is not confirmable.

Thus, it is true, as the Bankruptcy Court suggested, that § 1325(a)(5)(C) and § 1322(b)(9) are not, in all instances, mutually exclusive. However, in some situations, like this one, where its inclusion disrupts the mandatory treatment of a secured creditor under § 1325(a)(5), they *are* mutually exclusive, and the Plan's inclusion of both defeats confirmability.

In the Court's view, such a disruption is obvious in this case. Contrary to the position set forth by the Appellees, the Court finds that the Bank is entitled to the full array of property rights that accompany its position as first-priority lienholder,

including and especially the right to foreclose its security interest, or to refrain from doing so, as the case may be. See Tosi, 2016 Bankr. LEXIS 690, at *13-*14 (observing that the concept of surrender necessarily contemplates "permit[ting] the creditor to exercise its preexisting property rights as to the collateral"); Sherwood, 2016 Bankr. LEXIS 263, at *19-*21 (noting the right of a secured creditor "to do nothing to recover its collateral"); Rose, 512 B.R. at 793-94 (noting that there is no "requirement that the lender [ ] do anything with the property").

There can be no dispute that wielding the option of vesting under § 1322(b)(9) as a method of forcing the lender's hand to take some action with respect to the collateral that it would not otherwise take is a material curtailment of these rights. Thus, although the statutory language at issue does not expressly foreclose the possibility that real property may, under appropriate circumstances, be surrendered to and vested in the same secured creditor, in the Court's view, the incompatibility of these concepts in situations where the creditor withholds its consent is self-evident. See Tosi, 2016 Bankr. LEXIS 690, at *15-*16 ("[W]here vesting occurs, there is no true surrender. The surrender is illusory").

In this regard, the Court finds no support in the language of § 1322(b)(9) for concluding that, simply by virtue of its position as a mortgagee, the Bank is somehow susceptible to non-consensual reformation of its mortgage contract, or that its lien operates as a waiver of property rights under state law. Certainly that provision cannot be read as the Bank's assumption of liability for unbargained-for

carrying costs and exposure to the rights and obligations of junior lienholders with whom HSBC was not otherwise in privity.

In reaching this conclusion, the Court respectfully disagrees with the Bankruptcy Court's determination that § 1322(b)(9) would serve no conceivable purpose if not to facilitate debtors' repayment of secured claims with estate property. See Zair I, 535 B.R. at 21 (finding that "[r]eading § 1325 narrowly . . . essentially eliminates the usefulness of § 1322(b)(9)"). Since the issuance of that decision, other courts have written persuasively that this optional provision may, where appropriate, serve numerous functional purposes that do not conflict with the requirements of § 1325(a)(5)(C). See Weller, 2016 U.S. Bankr. LEXIS 108, at *9; Sherwood, 2016 Bankr. LEXIS 263, at *20-*21.

The Court also rejects the Appellees' argument that surrender is simply a natural first step in the broader act of transferring property out of the bankruptcy estate, namely, vesting. See Br. for Trustee at 7 (arguing that "surrender is a condition precedent to vesting property" because "Debtors cannot vest the property without surrendering it first"). As other courts have recognized, such an approach ignores the irreconcilable legal implications that arise when both surrender and vesting are included in a plan without the secured creditor's consent. See, e.g., Tosi, 2016 Bankr. LEXIS 690, at *12-*13 (determining that "[a] plan cannot do both while giving full and proper meaning to each term"); Williams, 542 B.R. at 522 (finding that "to construe surrender to include vesting would impair the state law rights of the secured creditor without providing any corresponding protective

limitation in the confirmation standards"); <u>Rose</u>, 512 B.R. at 795 (finding that non-consensual vesting "could impair a lender's rights in the collateral, subject it to ownership liabilities that never would  have voluntarily assumed, and contravene state property law").

In this regard, contrary to the Appellees' contention, surrender is generally not followed in the ordinary course by the mortgagee taking title to the collateral. Nor does the mortgagee's right to receive surrendered collateral contemplate its responsibility for ongoing carrying costs pending disposal of the property.  Nor does it potentially diminish the value of the mortgagee's first-priority lien by the amount of any junior liens which otherwise would have been extinguished by a foreclosure. On the contrary, these are unique consequences of vesting.  By contrast, the concept of surrender "means only that the debtor will make the collateral available so the secured creditor can, *if it chooses to do so*, exercise its state law rights in the collateral."  <u>Id.</u> at 518 (emphasis supplied). Therefore, in the Court's view, the imposition of the far more "consequential event" of vesting upon a non-consenting lender, who is entitled to the specific benefits and limitations of surrender, is inherently inconsistent with, and impermissibly impedes upon the creditor's rights sought to be preserved in § 1325(a)(5).

In the Court's view, this result is particularly warranted in this case because the property at issue, namely, the Long Beach Residence, was abandoned almost three years ago after being destroyed and rendered uninhabitable by a hurricane. Other courts – including some which have ultimately ruled in favor of the debtors –

have suggested that such circumstances may provide valid reasons for a mortgagee to resist accepting a conveyance of encumbered real property.  See, e.g., Rose, 512 B.R. at 795-96 (noting that forcibly vesting property "could significantly injure the lender" if, for example, "the collateral property is dilapidated, damaged, or otherwise a public nuisance"); Rosa, 495 B.R. at 525 (observing that a mortgagee may justifiably object to vesting where the subject property "is contaminated by hazardous waste").

Finally, the Court rejects the theory that the Debtors' pursuit of a fresh start in bankruptcy should be elevated above the other interests of the parties in this case.  Given the very clear delineation of secured creditors' rights in § 1325(a)(5); and the fact that Congress saw fit to fortify those rights by conditioning the confirmability of all Chapter 13 plans upon comformance with them; the Court can discern no principled basis for exalting the policy rationale in favor of "fresh starts" for debtors over the Code's obvious goal of preserving the well-settled property rights of secured lenders.   Other courts are in accord.  E.g., Watt, 2015 U.S. Dist. LEXIS 54041, at *19 n.6 (finding that a plan which purports to surrender and vest the same property in a secured lender failed to effect any meaningful balance of interests insofar as it "wholly eliminated [the debtors'] financial responsibility in relation to the Property, at the sole expense of a secured creditor"); see also Williams, 542 B.R.at 521 (finding the "tempt[ation] to . . . promote the debtor's fresh start," to be outweighed by the fact that "[v]esting the title over [the lender's]

objection would force it to accept the title and impose unbargained for obligations on it to pay taxes and other costs associated with the Property").

Accordingly, the Court finds that the underlying decision supplanted one of the requirements for confirmation found in § 1325(a)(5) with an optional nonstandard provision found in § 1322(b)(9). As in <u>Watt</u>, the result was the creation of a "fourth option" under § 1325(a)(5), which, in the Court's view, materially impaired the well-settled property rights of the Bank, requiring reversal.

## III.  Conclusion

Based on the foregoing, the Court reverses the underlying decision of the Bankruptcy Court; vacates the subject confirmation order; and remands this matter for further proceedings consistent with this Opinion.

The Clerk of the Court is directed to close this case.

Dated:      Central Islip, New York
            April 12, 2016

                              */s/ Arthur D. Spatt*
                              ARTHUR D. SPATT
                              United States District Judge